PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2811
_____

NICHOLAS BERGAMATTO,
Appellant

v.

BOARD OF TRUSTEES OF THE NYSA- ILA PENSION
FUND; CHARLES WARD
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-16-cv-5484)
District Judge: Hon. Kevin McNulty
_____

Submitted Under Third Circuit LAR 34.1(a)
June 3, 2019

Before: SMITH, *Chief Judge*, JORDAN, and MATEY,
*Circuit Judges.*

(Filed: August 6, 2019)
_____

Samuel J. Halpern
347 Mount Pleasant Ave. – Ste. 203
West Orange, NJ   07052
        *Counsel for Appellant*

Donato Caruso
Ian A. Weinberger
The Lambos Firm
303 South Broadway – Ste. 410
Tarrytown, NY   10591

Kevin J. Marrinan
John P. Sheridan
Marrinan & Mazzola Mardon
26 Broadway – 17th Fl.
New York, NY   10004

Kyle D. Winnick
Chamberlain Hrdlicka White Williams & Aughtry
191 Peachtree St. NW – 46th Fl.
Atlanta, GA   30303
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Nicholas Bergamatto appeals from the District Court's grant of summary judgment against him on his claims under the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1001 *et seq.* He contends that, under his pension plan, he is entitled to more benefits than he was awarded and that ERISA allows him to sue a "de facto administrator" of the plan for failing to provide requested information. We disagree and so will affirm the judgment of the District Court.

## I. BACKGROUND

The operative facts are not in dispute. Bergamatto began working for the Port of New York and New Jersey as a longshoreman in 2000. He last worked there in April 2010. In April 2013, he applied for retirement benefits under his pension plan.

That plan is the New York Shipping Association-International Longshoremen's Association Pension Trust Fund and Plan, a plan covered by ERISA. The 2010 version of the plan said that "[t]he provisions … in effect during the Participant's last year of credited service shall be applied to determine the Participant's right to benefits and the amount thereof." (Supp. App. at 5.) The 2010 plan also originally precluded longshoremen hired between October 1996 and September 2004 from accruing benefits for work performed before October 2004.[1] It did so by excluding from the definition of "Participant" "any employee who was not a Participant prior to October 1, 1996" and stating that:

---

[1] At all times relevant to this case, a year of credited service required a set number of hours of credited service and was based on an October 1 to September 30 fiscal year.

> [n]otwithstanding anything to the contrary contained in this Plan, any person who was first hired for employment in the longshore industry on or after October 1, 1996, and who was not a Participant as of September 30, 2004, shall be eligible to participate as a Participant in the Plan effective October 1, 2004, but shall not be entitled to accrue credited service for pension benefit accrual purposes under the Plan for any hours of employment earned prior to October 1, 2004.

(Supp. App. at 10-11.)

In 2013, however, an amendment was made to the 2010 plan. That amendment provided that, "[e]ffective October 1, 2012, Participants hired on or after October 1, 1996 shall receive pension benefit accruals for years of credited service earned from 1996 through 2004[.]" (D. Ct. D.I. 31-3, at *173.)[2]

The 2010 plan contained several administrative provisions. Among other things, it said that "[t]he Fund shall be administered by a Board of Trustees" (Supp. App. at 65) and that the Board had to "make available to the Fund's Participants and beneficiaries such reports and other documents as are required by ERISA" (Supp. App. at 68). It further provided that

---

[2] "D. Ct. D.I." refers to items listed on the District Court's docket.

4

> [t]he Board of Trustees shall have sole and absolute discretionary authority (1) to determine eligibility for benefits, (2) to interpret and construe the terms and provisions of the Trust and Plan, and (3) to make factual findings in connection with applications for benefits and to make other determinations involving application of the provisions of the Trust and Plan.

(Supp. App. at 73.)  Finally, it said that the Board "delegates to the Executive Pension Director … the power and authority to process and approve all non-disputed applications for pension benefits and to commence timely payments of such benefits" but that "[a]ll actions taken and decisions made pursuant to [that delegation] are subject to ratification by the Board of Trustees."[3]  (Supp. App. at 73.)

In January 2015, an updated version of the plan was produced.  Like the 2010 plan, the 2015 plan contained a "last year of credited service" clause, saying that "[t]he provisions of the Plan in effect during the Participant's last Year of Credited Service shall be applied to determine the Participant's

---

[3] Although the record is not entirely clear, it appears that the "Executive Pension Director" is the same individual elsewhere referred to as the Executive Director of the Fund. The delegated power of the Director in handling benefits applications is to be exercised in concert with "his counterpart designated by the [New York Shipping Association.]"  (Supp. App. at 73.)  That aspect of the plan's administration is not at issue in this case.

right to benefit and the amount thereof."[4]  (App. at 70.)  The 2015 plan also expressly incorporated the 2013 amendment to the 2010 plan, providing that, "[e]ffective October 1, 2012, Participants hired on or after October 1, 1996 shall receive pension benefit accruals for Years of Credited Service earned from 1996 through 2004."  (App. at 58.)  Relatedly, it eliminated the language preventing employees hired between October 1996 and September 2004 from accruing benefits for work prior to October 2004.  The 2015 plan also contained the same administrative provisions from the 2010 plan that have just been noted.

In June 2013, Bergamatto's application for pension benefits was approved by Charles Ward, Executive Director of the Fund, but based on only the years of credited service starting in October 2004.  Ward reasoned that the 2010 plan required that benefit determinations be made based on the plan provisions in force during the participant's last year of credited service, that Bergamatto's last year of credited service was 2010, and that the 2010 plan terms prevented longshoremen hired between October 1996 and September 2004 – like Bergamatto – from receiving benefit accruals for work performed before October 2004.

Bergamatto responded to Ward's decision by requesting that, in light of the 2013 amendment to the 2010 plan, his pension benefits incorporate his years of service before October 2004.  A series of communications between Ward and Bergamatto ensued, which ultimately led to Bergamatto

---

[4] The 2010 plan used the word "benefits" (Supp. App. at 5, 34), whereas the 2015 plan used "benefit" (App. at 70). The change does not appear to have been substantive.

6

accusing Ward of failing to respond to him as required by ERISA. Specifically, Bergamatto maintained that Ward had not adequately addressed his request for the pre-October 2004 benefit accruals and for the relevant plan provisions or summary plan description.

Bergamatto ultimately filed an appeal with the pension fund's Board of Trustees, which denied the appeal after a hearing. Its decision was based on the following reasoning: the 2015 plan "provides that the provisions of the Plan in effect during the Participant's last year of credited service shall be applied to determine the Participant's right to a benefit and the amount thereof"; Bergamatto's last year of credited service was 2010; the 2010 plan likewise "provides, with various exceptions that apply only to the amount of benefits, that the provisions of the Plan in effect during the Participant's last year of credited service shall be applied to determine the Participant's right to benefits and the amount thereof"; and the 2010 plan further "provides that … any person who was hired … on or after October 1, 1996, and who was not a Participant as of September 30, 2004, shall be eligible to participate as a Participant in the Plan effective October 1, 2004, but shall *not* be entitled to accrue credited service for pension benefit accrual purposes under the Plan for any hour of employment earned prior to October 1, 2004[.]'" (D. Ct. D.I. 31-3, at *206-07.)

The Board's decision was communicated to Bergamatto, and he then filed this action under ERISA, naming the Board of Trustees and Ward as defendants.[5] He claimed

---

[5] The timeliness of Bergamatto's claims is not disputed.

first that the denial of his claim for pre-October 2004 benefit accruals was erroneous, as it was based on a misinterpretation of the plan provisions and, second, that Ward's failure to adequately respond during the parties' correspondence amounted to a violation of the statutory responsibility of the plan administrator to respond to a plan participant.[6] The defendants ultimately moved for summary judgment, which the District Court granted.

As to Bergamatto's first claim, the Court concluded that, under the applicable "arbitrary-and-capricious standard" of review, the Board of Trustees' interpretation of the 2015 and 2010 plans was "reasonably consistent" with the plans' unambiguous language, which "makes clear that Bergamatto was not eligible for benefit accruals" for the years that he worked before October 2004. (App. at 15-16 (citation omitted).) Mirroring the Board's reasoning, the Court said that, under the 2015 plan, the terms in place during a participant's last year of credited service are controlling for purposes of benefit determinations; that Bergamatto's last year of credited service was 2010; and that, therefore, the 2010 plan governs Bergamatto's claim. It then concluded that the 2010 plan also requires that the provisions in effect during a participant's last year of credited service control. The Court said that the 2010 provisions preclude workers like Bergamatto from earning benefit accruals for years of service before October 2004, and that the 2013 amendment allowing such accruals was not in effect in 2010. It rejected Bergamatto's assertion that the "last year of credited service" clause does not

---

[6] Bergamatto raised other issues, but the District Court concluded "that he is no longer pursuing" them (App. at 12 n.5), and Bergamatto does not press them on appeal.

apply, saying instead that "the Clause does clearly apply to such accruals." (App. at 17.) The Court also disagreed with Bergamatto's contention that *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 417-19 (2014), dictated a result in his favor. According to the Court, Bergamatto's *Moench* argument failed because the Board's interpretation was consistent with the goals of the plan, did not render any language in the plan meaningless or internally inconsistent, did not conflict with ERISA, was not inconsistent with other Board interpretations, and was consistent with the clear language of the plan.

As to Bergamatto's second claim – that Ward breached an obligation to respond to Bergamatto's requests for information – the District Court observed that the claim was misdirected since the plan identifies the Board of Trustees, not Ward, as the administrator. The Court rejected Bergamatto's argument "that Ward is the *de facto* plan administrator[,]" reasoning that "the plain and unambiguous text of ERISA, as well as the weight of existing case law," foreclosed that argument. (App. at 20-21.) It noted that, although "[t]he Third Circuit has not yet ruled on" "whether a party can be held liable under [29 U.S.C. § 1132(c)(1)] under a de facto plan administrator theory[,]" numerous other circuit courts and the District of New Jersey have rejected that theory. (App. at 20.)

The Court also rebuffed two alternative arguments advanced by Bergamatto: that equitable estoppel should apply because "Ward 'never disavowed the title of Plan Administrator and never advised Bergamatto's counsel to redirect his request to the Board'"; and that Ward was a co-administrator because "a Notice [from the plan] advis[ed]

9

participants to contact the Board or Ward if they ha[d] additional questions[.]" (App. at 21 (citation omitted).) As to the first argument, the District Court said that Bergamatto could not satisfy the requirements of equitable estoppel because he had provided no evidence "that he detrimentally relied on Ward's alleged misrepresentations." (App. at 22.) As to the second, it determined that the Notice "is not sufficient to support a finding that Ward was a co-administrator" because it "identifies Ward as Executive Director, not co-administrator, and merely states that he can answer relevant questions." (App. at 22.)

Bergamatto timely appealed.

## II.    DISCUSSION[7]

On appeal, Bergamatto presses two claims: (1) that he is entitled to benefit accruals for the years he worked before October 2004; and (2) that Ward should be viewed as a de facto administrator of the pension plan and thus subject to liability

---

[7] The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). We have jurisdiction pursuant to 28 U.S.C. § 1291. "We exercise plenary review over the district court's grant of summary judgment, applying the same standard that the court should have applied." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 792 (3d Cir. 2010). "Summary judgment is appropriate if, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*

10

for failing to timely respond to Bergamatto's correspondence.[8] Bergamatto contends that the District Court erred in resolving those claims against him and should have granted summary judgment in his favor under Federal Rule of Civil Procedure 56(f).[9] We disagree and, consequently, will affirm.

### A. Bergamtto's Ineligibility for Benefit Accruals for Pre-October 2004 Service

With respect to his first claim, Bergamatto says that the Board of Trustees' decision was arbitrary and capricious in that it erroneously relied on the "last year of credited service" clause of the 2015 plan to deny his request for benefit accruals for pre-October 2004 work. In Bergamatto's view, that clause is inapplicable because it "appears to apply to the entitlement to and calculation of the pension benefit but is silent as to benefit accruals and appears to be a rule of general application." (Opening Br. at 15.) He says that the amendment granting benefit accruals for pre-October 2004 service for

---

[8] Bergamatto does not contend that the Board is liable for being unresponsive. He also does not raise equitable estoppel or assert that the District Court's rejection of his equitable estoppel argument was in error. We therefore consider these arguments forfeited. *See In re: Asbestos Prods. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017) ("As a general matter, an appellant waives an argument in support of reversal if it is not raised in the opening brief.").

[9] Bergamatto did not move for summary judgment, but Rule 56(f) provides, in relevant part, that, "[a]fter giving notice and a reasonable time to respond, the court may … grant summary judgment for a nonmovant[.]" Fed. R. Civ. P. 56(f).

workers such as him, as incorporated into the 2015 plan, should govern "because it directly addresses accruals." (Opening Br. at 15.) He maintains that he is covered by the amendment because he was a participant in the plan after the amendment's effective date of October 2012.

Bergamatto's first claim arises under 29 U.S.C. § 1132(a)(1)(B), which permits "a participant in an ERISA benefit plan [who has been] denied benefits" to bring suit "to recover benefits due to him under the terms of his plan." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 792 (3d Cir. 2010). Where a plan administrator possesses "discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" we review the administrator's decision under an "abuse of discretion" standard[10] or an "arbitrary and capricious" standard,[11] which, in this context, are effectively the same. *Id.* at 792, 793 n.6 (citation omitted); *see also Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 n.2 (3d Cir. 2012) ("We have clarified that '[i]n the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical.'" (alteration in original) (citation omitted)). Here, both the 2015 and 2010 plans grant

---

[10] "An administrator's decision constitutes an abuse of discretion only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Howley*, 625 F.3d at 792 (citation omitted).

[11] "An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (internal quotation marks and citation omitted).

the Board such discretionary authority, and it is undisputed that the Board possesses it.

Under our broadly deferential standard of review, we first consider whether the language of an ERISA plan is ambiguous, i.e., "subject to reasonable alternative interpretations." *Bill Gray Enters., Inc. Emp. Health & Welfare Plan v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001) (citations omitted). If the plan's language is unambiguous, "we will not set aside the administrator's interpretations … as long as those interpretations are 'reasonably consistent' with the plan's text[.]"[12] *Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 245 (3d Cir. 2017) (quoting *Fleisher*, 679 F.3d at 121). "If the reviewing court determines the terms of a plan document are ambiguous, it must take [an] additional step and analyze whether the plan administrator's interpretation of the document is reasonable." *Bill Gray Enters.*, 248 F.3d at 218.

---

[12] In assessing whether an administrator's interpretation is "reasonably consistent" with plan language, we are not considering whether the interpretation is one reasonable alternative. By definition, when plan terms are clear, they have only one meaning and are "unsuited to any further interpretation." *Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 192 (3d Cir. 2011), *abrogated on other grounds by Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 656-57 & n.2 (2016). What we are doing, instead, is considering whether the administrator acted within the scope of the plan's unambiguous terms while engaging in "straightforward Plan execution[.]" *Id.* at 192 & n.12.

Bergamatto's argument fails at the first step because the plan language at issue here is unambiguous and the Board's decision is "reasonably consistent" with that language. The 2015 plan states expressly that "[t]he provisions of the Plan in effect during the Participant's last Year of Credited Service shall be applied to determine the Participant's right to benefit and the amount thereof."[13] (App. at 70.) The original 2010 plan contains the same "last year of credited service" clause and directly forbids workers hired between October 1996 and September 2004 from earning benefit accruals for pre-October 2004 work.[14] And, the effective date of the 2013 amendment that changed that restriction and authorized such benefit accruals was October 1, 2012, well after Bergamatto's last year of credited service in 2010. The language of the un-amended 2010 plan is thus controlling. Given that Bergamatto was hired in 2000, he is subject to the benefit accrual exclusion for pre-October 2004 work. We cannot see how the 2015 and 2010 plans could be read in any other way. The Board's decision

[13] The Board of Trustees considered the 2015 plan to be the operative one, and Bergamatto too relies on that plan to support his arguments. We will assume that the 2015 plan is the appropriate one to look to, although we need not conclusively resolve whether the 2015 or 2010 plan governs because, in any event, the 2015 plan looks to the 2010 plan for the decisive language.

[14] Recall that the 2010 plan provides that any longshoreman hired "on or after October 1, 1996, and who was not a Participant as of September 30, 2004 … shall not be entitled to accrue credited service for pension benefit accrual purposes under the Plan for any hours of employment earned prior to October 1, 2004." (Supp. App. at 10-11.)

14

tracks that reading and is thus "reasonably consistent" – in fact, totally consistent – with the unambiguous language of the plans.

Bergamatto's suggestion that the "last year of credited service" clause does not encompass benefit accruals is unpersuasive. That clause, under both the 2015 and 2010 plans, is framed expansively, covering any term used to determine a participant's right to benefits and the amount thereof. The clause, on its face, encompasses anything that could affect the benefits a worker receives, and it is hard to imagine how the accrual of benefits could fall outside its reach. Indeed, under both the 2015 and 2010 plans, "Accrued Benefit" is defined as the monthly pension benefit – i.e., the amount of benefit – that a participant in the plan would be entitled to receive if certain conditions were met. (App. at 48; Supp. App. at 14.) And Bergamatto necessarily concedes that benefit accruals affect the amount of a pension, given that he has consistently sought benefit accruals for additional years in order to increase his pension.

In light of all that, Bergamatto's remaining arguments are unavailing. His assertion that the amendment should govern since it directly addresses benefit accruals fails because, if the "last year of credited service" clause applies to benefit accruals (and it does), the 2010 provisions relating to benefit accruals must control. No one disputes that Bergamatto's last year of credited service was 2010. And, again, because that was his last credited year, the 2010 provisions govern. Bergamatto's argument that he was a participant in 2012 – when the amendment authorizing the benefit accruals Bergamatto seeks became effective – is thus irrelevant.

15

In sum, the plan language is unambiguous; the Board's interpretation aligns with that language; and Bergamatto's first claim fails.[15]

## B.     The "De Facto" Plan Administrator Theory

As to Bergamatto's second claim, he cites 29 U.S.C. § 1132(c) and says that "a plan administrator who fails or refuses to comply with a request for information which the administrator is required by law to provide to a participant or beneficiary within 30 days is subject to a penalty of $100.00 per day." (Opening Br. at 17.)  He then asserts that Ward failed to respond to his request for "a copy of the pertinent plan provisions or a summary plan description" within that 30-day period.  (Opening Br. at 17.)  Bergamatto maintains that Ward

---

[15] Bergamatto's arguments rely on our decision in *Moench*, in which we adopted "factors to consider in determining whether an interpretation of a plan is reasonable[.]"  62 F.3d at 566; *see also Howley*, 625 F.3d at 795 (noting that we consider the *Moench* factors "[i]n determining whether an administrator's interpretation of a plan is reasonable").  He frames all of his arguments using *Moench*, and he asserts that the Board's interpretation would frustrate the goals of the plan, which is an argument tied specifically to the *Moench* factors.

The *Moench* factors, however, are inapposite here.  They apply in evaluating the reasonableness of an administrator's interpretation.  But we only move to that inquiry if we decide that the terms of a plan document are ambiguous. *Bill Gray Enters.*, 248 F.3d at 218, 220 n.12; *see supra* note 11.  In the present case, the plan is clear.

16

should thus be penalized because, even though he has the title of Executive Director of the plan, he is a de facto plan administrator. According to Bergamatto, "Ward appeared to function in all respects as a plan administrator" – for example, answering participants and beneficiaries' questions, supplying them with information they requested, and providing summary plan descriptions – and that, "more importantly, he never disavowed the title." (Opening Br. at 18.) As the District Court noted and Bergamatto acknowledges, a majority of our sister circuits have rejected the de facto administrator theory. He nevertheless asserts that we should not follow those other courts.

His claim arises under 29 U.S.C. § 1132(a)(1)(A), which allows a participant or beneficiary to sue "for the relief provided for in [29 U.S.C. § 1132(c).]" 29 U.S.C. § 1132(a)(1)(A). The specific provision at issue is § 1132(c)(1), which provides, in relevant part:

> *Any administrator* … who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request *may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal*, and the

17

> court may in its discretion order such other relief as it deems proper.

*Id.* § 1132(c)(1) (emphasis added).[16] In short, that provision allows suit against *an administrator* for not responding to requests for certain information.

Ward, however, does not formally qualify as an "administrator" for purposes of 29 U.S.C. § 1132(c)(1). Under ERISA, the word "administrator" is defined as "the person specifically so designated by the terms of the instrument under which the plan is operated[,]" if there is such a designation.[17] *Id.* § 1002(16)(A). Both the 2015 and 2010 plans designate the Board of Trustees – and only the Board of Trustees – as the administrator.[18]

---

[16] For instance, 29 U.S.C. § 1024(b)(4) requires "[t]he administrator" to, "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).

[17] Otherwise, the "administrator" is "the plan sponsor" or, if "an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary [of Labor] may by regulation prescribe." 29 U.S.C. § 1002(16)(A).

[18] Bergamatto asserts that Ward should be viewed as a co-administrator because a Notice from the plan told "participants and beneficiaries to contact the Board of Trustees

18

That leads to the question of whether a person, like Ward, who does not fit the statutory definition of "administrator" may be liable under 29 U.S.C. § 1132(c)(1) as a de facto administrator. We have not previously addressed that question. Most courts that have, though, have rejected the idea. *See Ibson v. United Healthcare Servs., Inc.*, 877 F.3d 384, 390-91 (8th Cir. 2017); *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 793-94 (7th Cir. 2009); *Sgro v. Danone Waters of N. Am., Inc.*, 532 F.3d 940, 945 (9th Cir. 2008) (citing *Moran v. Aetna Life Ins. Co.*, 872 F.2d 296, 299-300 (9th Cir. 1989)); *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) (citing *Lee v. Burkhart*, 991 F.2d 1004, 1010 n.5 (2d Cir. 1993)); *Averhart v. US WEST Mgmt. Pension Plan*, 46 F.3d 1480, 1489-90 (10th Cir. 1994); *see also Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 486 (5th Cir. 2017) (observing that "[t]he Fifth Circuit has never adopted the *de facto* plan administrator theory[,]" that "[t]he *de facto* administrator argument has been flatly rejected by at least eight circuits[,]" and that "[a]nother two circuits 'have refused to extend the *de facto* administrator doctrine to an insurance company involved in claims handling,'" as in the case at bar (third alteration in original) (citations omitted));[19]

_____

*or* Ward if they have questions or to request additional information." (Opening Br. at 18.) But that Notice does not change who the plans specify as administrator, and the Notice characterizes Ward as "Executive Director," not administrator. (D. Ct. D.I. 11-2, at *20.)

[19] The Fifth Circuit has not clarified whether *Humble* constituted a wholesale rejection of the de facto administrator theory. It has since cited that case for the proposition that "the

19

*Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1138 (D.C. Cir. 1989) (concluding that an insurer could not be liable under 29 U.S.C. § 1132(c) because it was "nowhere designated by the plan as 'administrator'" and no one had suggested that the insurer "fit[] within the statutory definition of 'plan sponsor'").[20] Only two appellate courts appear to have adopted the theory,[21] *Rosen v. TRW, Inc.*, 979 F.2d 191, 193-94 (11th

---

Fifth Circuit does not recognize a de facto administrator doctrine *in the context of an insurance company involved in claims handling.*" *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 483 & n.87 (5th Cir. 2018) (emphasis added).

[20] The D.C. Circuit has not cited *Davis* or addressed the de facto administrator issue since, so the scope of that decision is not wholly clear. *Cf. Law v. Ernst & Young*, 956 F.2d 364, 374 (1st Cir. 1992) (distinguishing *Davis* on the ground that it "involved [an attempt] to recover against entities which were clearly distinct from the plan administrator and which were not shown to have exercised actual control over the administrator's functions"). At least one court, however, has read *Davis* as rejecting the de facto administrator theory. *Jones v. UOP*, 16 F.3d 141, 145 (7th Cir. 1994).

[21] Two other Courts of Appeals have suggested that they might adopt the de facto administrator theory in the appropriate case. The Sixth Circuit has remanded where "the record did not sufficiently explain the relationship between the employer and the plan administrator for it to determine liability." *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 843 (6th Cir. 2007) (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 759 (6th Cir. 2005)). *But see Mondry*, 557 F.3d at

Cir. 1992); *Law v. Ernst & Young*, 956 F.2d 364, 374 (1st Cir. 1992), and both have done so only to a limited degree, *see Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1194 (11th Cir. 2007) ("*Rosen* applied the *de facto* administrator doctrine to employers, not to third-party administrative services providers."), *vacated in part on other grounds by Oliver v. Coca Cola Co.*, 506 F.3d 1316, 1317 (11th Cir. 2007); *Tetreault v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 60 (1st Cir. 2014) ("*Law* was careful to distinguish the case before it, which involved an employer with 'little, if any, separate identity' from the internal retirement committee that had been designated as the 'plan administrator,' from cases involving 'attempts to recover against entities which were clearly distinct from the plan administrator.'" (citation omitted)).

---

794 (concluding that *Gore* supports the view that Courts of Appeals "have held that liability under section 1132(c)(1) is confined to the plan administrator"). Similarly, the Fourth Circuit has suggested that a non-administrator could assume the administrator's duty to provide documents and be subject to suit. *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 62 n.3 (4th Cir. 1992). *But see id.* at 62 (holding that an insurer had no duty to provide documents as an administrator and reasoning that, "[w]hile it is true that an insurer will usually have administrative responsibilities with respect to the review of claims under the policy, that does not give this court license to ignore the statute's definition of plan administrator and to impose on [the insurer] the plan administrator's notification duties"); *Jones*, 16 F.3d at 145 (indicating that *Coleman* rejected the de facto administrator theory).

21

We are persuaded by the weight of authority, as well as the plain text and character of the statutes at issue,[22] and so reject the de facto administrator theory. As set out above, § 1132(c)(1) imposes liability only on administrators. We have said that "administrator" is a "term[] of art under ERISA[,]" defined, with certain exceptions, "as 'the person specifically so designated by the terms of the instrument under which the plan is operated.'" *Groves v. Modified Ret. Plan for Hourly Paid Emps. of Johns Manville Corp. & Subsidiaries*, 803 F.2d 109, 116 (3d Cir. 1986) (citation omitted). To treat those who do not fully satisfy that "detailed definition[]" as administrators "would 'slight[ ] the wording of the statute[.]'" *Id.* (second alteration in original) (citation omitted). We cannot allow that, for three reasons.

First, the Supreme Court has taught, quite forcefully, that courts should avoid reading remedies into ERISA's carefully-crafted enforcement scheme:

> The … carefully integrated civil enforcement provisions found in § 502(a) … provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's

---

[22] *See* 29 U.S.C. § 1002(16) (defining "administrator"); *id.* § 1024(b)(4) (mandating that it is the "administrator" that "shall" furnish certain documentation to the participant or beneficiary); *id.* § 1132(c)(1) (specifying that it is an "administrator" that may be "personally liable" for failing to comply with the statutory duty of furnishing information).

interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a "comprehensive and reticulated statute." … We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA.

*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146-47 (1985) (citation omitted); *see also Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1167, 1169-70 (3d Cir. 1990) (relying on *Russell* to conclude that a "rather freewheeling statutory construction [of ERISA], even though embarked upon to vindicate correctly perceived underlying purposes, has little place in the context of a carefully balanced and reticulated statute like ERISA").

Second, § 1132(c) "is a penal provision" and, as such, "should be leniently and narrowly construed[.]" *Groves*, 803 F.2d at 111, 118; *see also Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan*, 24 F.3d 1491, 1505 (3d Cir. 1994) ("We start our discussion … [concerning 29 U.S.C. § 1132(c)(1)] by pointing out that statutory penalty provisions are construed strictly.").

Third, we have in fact consistently construed this statutory penalty provision narrowly and there is no reason to depart from that approach. *See Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 147 (3d Cir. 2007) (reversing the district court's award of a penalty under § 1132(c) because the applicable ERISA provision pertained to fiduciaries, not plan administrators, and the obligation to provide information was contained in the Plan, not ERISA); *Haberern*, 24 F.3d at 1505-06 (setting aside the § 1132(c) penalty because the plaintiff's

23

request, instead of seeking documentation that a plan administrator must provide, simply asked to schedule a meeting); *Groves*, 803 F.2d at 111 (affirming the district court's determination that a § 1132(c) sanction could not be imposed upon a plan administrator because ERISA imposed the duty to furnish documentation "exclusively on 'the plan,' not upon the 'plan administrator[,]'" and limiting liability for the administrator's breach of a regulation because § 1132(c) applied to failures to comply with a request under "this subchapter[,]" which did not encompass regulations promulgated under the statute).

In short, we must restrict application of the title "administrator" to those who fit the statutory definition and not stretch the term to authorize penalties against others whom a disappointed plan participant might like to reach. That means that Ward is not an administrator, "de facto" or otherwise.[23] At

---

[23] That conclusion is not altered by the fact that the 2015 and 2010 plans delegate to the Executive Pension Director the Board's "power and authority to process and approve all non-disputed applications for pension benefits and to commence timely payments of such benefits[,]" subject to ratification by the Board. (Supp. App. at 73; D. Ct. D.I. 31-3, at *276.) That language does not show that the Executive Pension Director is the statutory administrator, even for disclosure purposes. Indeed, the plans require *the Board* to "make available to the Fund's Participants and beneficiaries such reports and other documents as are required by ERISA." (Supp. App. at 68; D. Ct. D.I. 31-3, at *272.) Moreover, a non-administrator does not become an administrator simply by virtue of possessing responsibilities under a plan. *See Ross v. Rail Car Am. Grp. Disability Income Plan*, 285 F.3d 735, 743 (8th Cir. 2002)

least in this context, then, there is no such thing as a "de facto administrator," and Bergamatto's second claim fails.

## III. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.

---

("Canada Life admits that it had control over claims under the policy, but assuming that function did not transform it into the Plan Administrator."); *Averhart*, 46 F.3d at 1489-90 ("[E]ven where 'company personnel other than the plan administrator routinely assume responsibility for answering requests from plan participants and beneficiaries … [t]he statutory liability for failing to provide requested information remains with the designated plan administrator[.]'" (second alteration in original)).